FILED

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

03 MAR 24 PM 12:49

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| BENITA WRIGHT, | } |
| Plaintiff, | } |
| v. | } CASE NO. CV 00-B-1542-S |
| EPSCO TEMPORARY EMPLOYMENT AGENCY, d/b/a EBSCO, Inc., | } |
| Defendant. | } |

ENTERED

MAR 24 2003

## MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by Defendant EPSCO Temporary Employment Agency, Inc. ("defendant" or "EPSCO"). Plaintiff, Benita Wright ("plaintiff" or "Wright"), an African-American female, claims EPSCO discriminated against her by subjecting her to a work environment that was hostile or abusive because of racial harassment and by terminating her in retaliation for engaging in protected activity in violation of both Title VII and 42 U.S.C. § 1981.[1] Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

### I. FACTUAL SUMMARY

Defendant EPSCO is a provider of temporary employees based in Tupelo, Mississippi, with an office in Birmingham, Alabama. On August 1, 1995, Wright began working as the office

---

[1] Plaintiff's Complaint contained claims of sex and disability discrimination. Plaintiff has abandoned these claims. (Wright Dep. at 6-7.) Plaintiff's Complaint also contained claims for outrage and negligent supervision/negligent retention. On January 4, 2002, plaintiff filed a notice of dismissal of these claims.



manager at EPSCO's Birmingham office. (Pl.'s Ex. 1, Wright Decl. at 1; Def.'s Ex. A, Wright Dep. at 69.) She held that position for approximately three years and nine months before she took medical leave the week of April 26, 1999.[2] (Def.'s Ex. B, Patricia Pannell Aff. ¶ 10; *id.*, Ex. C; Wright Dep. at 292.) Wright has not returned to work for the defendant. (Wright Dep. at 237-38.)

On September 17, 1999, Wright filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On June 5, 2000, Wright filed her complaint in this court, asserting race discrimination claims under Title VII and 42 U.S.C. § 1981 based on hostile environment and retaliation. In support of her claims, Wright alleges that, during her employment with the company, EPSCO made several discriminatory employment decisions affecting her work, and Milton Clegg ("Clegg"), the president of EPSCO, made several racially derogatory statements. The court details these allegations below.

**A. Discriminatory Employment Decisions**

    **1. 1996 Threat of Replacement**

In November 1995, Wright hired James Tillman ("Tillman"), a white male, as an office clerk in Birmingham. (Wright Dep. at 166-67; Def.'s Ex. R, Tillman Aff. ¶ 2.) At some point later, at a meeting in Tupelo, Mississippi, Wright claims that Clegg announced that he was going to replace her with Tillman. (Wright Dep. at 165-66.) Allegedly, Clegg said Tillman "was better suited for the Birmingham office" than plaintiff. (Wright Dep. at 166-67; Tillman Aff. ¶ 2.)

---

    [2]By recommendation of her doctor, Wright's medical leave was extended for two more weeks, (Def.'s Ex. B., Patricia Pannell Aff., Ex. G, Letter from Dr. Anderson to Pannell of 5/6/1999; *id.*, Ex. F., Letter from Pannell to Wright of 5/5/1999), and then later for an indefinite period of time, (Pannell Aff., Ex. H, Letter from Dr. Anderson to Pannell of 6/2/1999; Wright Dep. at 246.)

2

Wright testified that she complained to Clegg and others about this threatened move. (Wright Dep. at 164-68.) Wright also testified, however, that Tillman never actually replaced her as office manager in Birmingham, (*id.* at 166), and Tillman testified that EPSCO never offered him Wright's position, (Tillman Aff. ¶ 6). In February 1996, EPSCO did promote Tillman to office manager, transferring him to the Tuscaloosa office where he stayed two months before leaving EPSCO. (*Id.* ¶ 3; Def.'s Ex. L, Clegg Dep. at 101.)

### 2. February 1997 Demotion

Wright claims she was demoted in February 1997, when EPSCO hired Diane Burbidge ("Burbidge"), a white female, to work in the Birmingham office. (Wright Dep. at 176-80; Pl.'s Ex. 8, Memo from Wright to Clegg of 2/6/1997.) Wright testified that Clegg told her he hired Burbidge to replace her as office manager, and that Burbidge was to assume all of Wright's duties except sales.[3] (Memo from Wright to Clegg of 2/6/1997; Wright Dep. at 176-80, 201-02.) Plaintiff wrote a letter to Clegg expressing her disagreement with the hiring of Burbidge, and asking him to reconsider. (*See* Memo from Wright to Clegg of 2/6/1997.) Clegg maintains Burbidge was not hired to replace Wright as the office manager. (Clegg Dep. at 75-76, 84, 89.) Responding to Wright's concerns, Clegg explained that he hired Burbidge to help Wright run the office so she could concentrate on and increase sales, thereby making the Birmingham office more productive. (Pl.'s Ex. 9, Letter from Clegg to Wright of 2/10/1997; *see also* Clegg Dep. at

---

[3]Wright's job duties included obtaining new customers (often referred to by the parties as "sales" or "outside sales"), filling customers' requests for temporary services, recruiting employees to fill the customer requests, hiring people to work in the office, doing the payroll, and processing accident and workers' compensation claims regarding EPSCO's temporary employees. (Clegg Dep. at 76.) Clegg testified that the main responsibilities of the office manager are sales and "making sure the inside is being run properly." (*Id.* at 36; *see also id.* at 29-30.)

3

47, 68-80, 84, 89-92.) Burbidge worked at EPSCO for less than one month before leaving. (Wright Dep. at 194-95.) Plaintiff also testified that, during the brief time that Burbidge worked in Birmingham, plaintiff performed all of her managerial duties. (*See* Wright Dep. at 197-98 ("I still filled job orders, answered the phone, recruited. I still did all of those things in addition to sales. When Diane was hired, I still did all those duties.").)

### 3. Reduction in Pay

There is conflicting evidence concerning the amount Wright was compensated before, during, and immediately after Burbidge's brief time with EPSCO. Before February 1997, Wright's base salary was $300 per week plus a commission of 5% of gross weekly profits, if such profits fell below $1,000 per week, or 10% of gross weekly profits, if such profits exceeded $1,000. (Pannell Aff. ¶ 4.) According to EPSCO, Wright's weekly compensation, during the course of her employment, was derived using this formula. (*See id.*, Ex. A.)

Plaintiff, however, claims that when Burbidge was hired, her commission rate was reduced from 10% to 5% on gross weekly profits over $1,000. (Memo from Wright to Clegg of 2/6/1997; Wright Dep. at 182.) The record contains evidence that Patricia Pannell ("Pannell"), Vice-President of EPSCO, completed a Personnel Change Notice that directed a change in plaintiff's commission rate effective February 17, 1999. (Pl.'s Ex. 7, Personnel Change Notice of 2/7/1997.)[4] Defendant contends, however, that this change was never implemented. (Clegg Dep. at 80-82, 87-88; Dyan Cayson Aff.; *see also* Pannell Aff. at 1; *id.*, Ex. A.)

---

[4]The same form indicates that Wright's job title changed from "Manager" to "Sales Manager." (Pl.'s Ex. 7, Personnel Change Notice of 2/7/1997.)

4

The record contains evidence documenting the weekly gross profits for the Birmingham office. According to the evidence, weekly gross profits for the Birmingham office exceeded $1,000 three times between January 1997 and March 1997: in the week of January 12, 1997 ($1,297.33), in the week of February 2, 1997 ($1,091.88), and in the week of March 23, 1997 ($1,440.49). (Pannell Aff., Ex. A.) During those weeks, the same records indicate that plaintiff's commissions were, respectively, $126.49, $106.46, and $136.85. According to the court's calculations, EPSCO paid Wright a commission between 9.5% and 9.75% on each of these occasions. EPSCO did not pay her a 5% commission, as Wright alleges and the Personnel Change Notice indicates.

### 4. Disparate Pay

Wright alleges she was paid less than white employees.[5] (*See* Pl.'s Br. at 15-18.) Defendant submitted evidence of the base pay and/or commission rate of twelve Alabama office managers. (*See* Pannell Aff., Ex. O.) According to these records, Wright was neither the highest nor the lowest paid officer manager at EPSCO. (Pannell Aff., Ex. O.)

---

[5]Clegg admitted that EPSCO paid Tom Schmit ("Schmit") and Patrick Branch ("Branch"), two white males who performed Wright's job duties during her medical leave in 1999, a base salary of $400 per week, $100 more than plaintiff, and a commission rate lower than the rate paid to plaintiff. (Clegg Dep. at 108-09.) Clegg testified that Schmit and Branch were paid this amount because of the difficulty filling that position on a temporary nature; he testified:
> We had to pay more to be able to contract somebody to come in. Because anybody that came in didn't know if they were going to be there six months from now because Benita was on medical leave. And I wasn't going to guarantee anybody that. . . . And again, I couldn't guarantee them how long they would be there. If they made a sale, they may get commission on that sale for one month. Because if Benita came back, everything that they sold would go into her commissions.

(*Id.*)

5

### 4. July 1998 Demotion

Wright claims EPSCO demoted her when it attempted to hire Star Dexter ("Dexter"), a white female, in July 1998, to replace her as office manager in Birmingham. (Wright Dep. at 212-13; Def.'s Ex. D, Dexter's Sworn Stat. at 5, 15.) At a breakfast meeting in July 1998, attended by Wright, Clegg, Pannell, and Dexter, Wright claims that Clegg told her he intended to hire Dexter as her replacement as office manager in Birmingham. (Wright Dep. at 208-09; Dexter's Sworn Stat. at 15.) Wright objected to this proposed demotion in a memorandum to Clegg in which she wrote that she believed he was discriminating against her because of her race. (*Id.* at 210; Clegg Dep. at 136-37; Pl.'s Ex. 11, Undated Memorandum from Wright to Clegg.)[6] Clegg testified that when Wright complained to him about adding Dexter to her staff, he tried to find separate office space in Birmingham from which Dexter could work. (Clegg Dep. at 136-37; *see also* Dexter's Sworn Stat. at 9.) Ultimately, however, Dexter turned down Clegg's offer of employment. (Clegg Dep. at 138; Pannell Aff. ¶ 7; Wright Dep. at 210-11.)

### 5. Termination

As set forth above, plaintiff took medical leave in April 1999.[7] Wright contends that she was terminated. As evidence of her termination, Wright offers a job order form sent by EPSCO to the Alabama Department of Industrial Relations in May 1999, indicating the company's willingness to hire someone for the Birmingham office to perform Wright's job duties. (*See* Pl.'s

---

[6]Plaintiff has submitted as evidence an undated document she claims she wrote and sent to Clegg shortly after the Dexter incident. (*See* Pl.'s Ex. 11, Undated Memorandum from Wright to Clegg.) Clegg testified that he had never seen this document before plaintiff's counsel showed it to him during his deposition. (Clegg. Dep. at 132-33.)

[7]*See supra* note 2, noting that plaintiff took an extended medical leave pursuant to doctor's orders.

Ex. 6, Job Order.) Indeed, EPSCO did hire two white males who performed Wright's job duties during her absence: Schmit and Branch. (Clegg Dep. at 107-09.) EPSCO contends that these individuals were hired as acting, or temporary, managers of the Birmingham office while the plaintiff was out on leave.[8] (Def.'s Ex. T, Pannell Aff. II ¶¶ 5-6.) Both Wright and Clegg believed she would return to work at some point. (Wright Dep. at 242-46; Clegg Dep. at 108-09.)

EPSCO maintains that it never terminated Wright. (Pannell Aff. ¶ 13). While on leave, plaintiff discussed her return to work with Clegg, who told her that she could not return to work without a "full medical release" from her doctor. (Wright Dep. at 242.) The record indicates that Wright never provided Clegg with a medical release and that she has not returned to work.

A final piece of evidence regarding Wright's status at EPSCO, post-April 1999, is an insurance form completed on August 26, 1999, by Clegg. The form begins, "Dear Employer: In order to give prompt attention to a claim filed by our above insured, *who is employed by you*, please answer the questions below." (Def. Ex. W, Insurance Form (emphasis added).) Clegg indicated that Wright's medical disability was the sole reason that Wright was not working at that time and that she was on indefinite medical leave.

## B. Clegg's Racially Derogatory Statements

Wright claims she received a telephone call from an unidentified, female EPSCO employee who told her that she had overheard "Paula Michaels making remarks that Milton

---

[8]Wright admitted that EPSCO would have needed to hire someone to act as manager in her absence. (Wright Dep. at 239.)

Clegg had said that [Wright's] black ass better work or [her] black ass would be out."[9] (Wright Dep. at 220-22.) Wright called EPSCO's corporate office attempting to contact Clegg, but her attempts to reach him were initially unsuccessful. (*Id.* at 221.) Dyan Cayson, an employee at the corporate office, returned plaintiff's call within ten minutes in an effort to console her and assure her that Clegg would not have made such a comment. (*Id.* at 222.) Later, Clegg spoke with Wright and assured her he did not make the reported remark. (*Id.* at 223.)

Wright also alleges that Clegg referred to African-Americans as "you people," and made derogatory remarks about Wright opening an office in "the projects" so she could recruit her "own people," and noted that "who better than you to recruit your own people."[10] (Wright Dep. at 226-29, 233; Pl.'s Br. at 2-3.) Clegg denies making these statements. (Clegg Dep. at 135-36.)

Wright also alleges she was told by Kathy Parker, another employee at EPSCO, that Clegg, referring to plaintiff, told Parker "to back off or leave her alone because this one could cause him problems."[11] (Wright Dep. at 235.) Lastly, Wright claims that an unidentified person told her that Clegg said "if he ever got rid of [plaintiff] he would never hire another one." (Wright Decl. at 3.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The

---

[9]The time frame that plaintiff received this alleged phone call is not clear from the record.

[10]Wright testified that she never heard Clegg make any racial curses or use racial profanity. (Wright Dep. at 226.)

[11]Wright does not recall when she overheard this alleged statement. (Wright Dep. at 235.)

8

party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

#### A. Hostile Environment Claim – Title VII and § 1981

Title VII prohibits employers from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Section 1981 also prohibits employment discrimination on the basis of race. 42 U.S.C. § 1981. To maintain a claim based on a racially hostile environment under either statute, a plaintiff must first establish her prima facie case by showing: (1) she belongs to a protected group; (2) she has been subjected to unwelcome racial harassment;

9

(3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment and create an abusive working environment; and (5) a basis for holding the employer liable. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (stating that elements of a prima facie case are the same under Title VII and § 1981).

The fourth element of the prima facie case "tests the mettle" of plaintiff's claim, for "[r]equiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere 'general civility code.'" *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000). This element has both an objective and subjective component. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). For purposes of deciding defendant's motion for summary judgment, the court assumes Wright subjectively perceived her work environment was hostile due to racial harassment, and will focus on whether or not a reasonable person would have found the work environment sufficiently hostile and abusive to alter the terms and conditions of her employment. *See id.* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). Whether an environment is "hostile" or "abusive" must be determined by looking at the totality of the circumstances, and not in terms of isolated events, considering such factors as the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating as opposed to merely offensive, and whether the conduct unreasonably interferes with an employee's work performance. *Mendoza*, 195 F.3d at 1242, 1246.

As a threshold matter, the court finds that plaintiff alleges several discrete instances of race discrimination, and concludes that these allegations should not be included in the "totality of

10

the circumstances" the court considers to determine whether the plaintiff was subjected to a hostile work environment. Hostile environments develop after, and are proven by evidence of, the cumulative effect of repeated, offensive acts of harassment – conduct, jokes and epithets. In that regard, "[h]ostile environment claims are different than discrete acts," *AMTRAK v. Morgan*, 536 U.S. 101, ___, 122 S. Ct. 2061, 2073 (2002), because discrete acts of employment discrimination, including "termination, failure to promote, denial of transfer or refusal to hire," *id.* at 2073, have an immediate effect on the terms and conditions of an employee's job, *id.* at 2071. Title VII provides for separate causes of action based on discrete discriminatory acts.

In addition, although the court typically must consider all acts that occur during the entire period of the alleged hostile environment, the court need not consider acts about which an employee complains that are not part of the same hostile environment. *Morgan*, 122 S. Ct. at 2076. Discrete acts of race discrimination will rarely, if ever, be part of the same, alleged hostile environment. *See Huckabay v. Moore*, 142 F.3d 233, 239-40 (5th Cir. 1998) ("[The Plaintiff's] demotion is a different sort of discrimination from the day-to-day harassment that makes his workplace a hostile environment. Moreover, he was demoted only once, and unlike the cumulative effect of the petty annoyances of daily harassment, demotion is the sort of discrete and salient event that should put an employee on notice that a cause of action has accrued. It does not constitute a part of the same pattern of behavior that amounts to a continuous violation by rendering [the Plaintiff's] workplace a hostile environment.") The discrete acts alleged in this case present no exception. Therefore, as it relates to the hostile environment claim, the court will not consider Wright's allegations that she was demoted, threatened with replacement (*i.e.*, with

11

Tillman and later with Dexter), terminated, that her pay was reduced, or that she was generally paid less than similarly situated white employees.[12]

Plaintiff's remaining allegations are the allegedly derogatory statements.[13] Wright alleges that five comments were made during the three years and nine months that she worked at EPSCO, and that two of them were made on multiple occasions, *i.e.*, the alleged references to African-Americans as "you people," and the alleged statement that Wright was well suited to recruit people in the projects. Although there is no "magic number" of racial insults required for an actionable hostile environment claim, *Miller*, 277 F.3d at 1276 (quoting *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 704 (7th Cir. 2001), plaintiff's evidence falls short of that produced in other cases. *See Miller*, 277 F.3d at 1276 (finding sufficient frequency of harassing

---

[12]As a final point, if the court did not make such a finding, plaintiff would be able to resurrect as evidence of a hostile environment discrete acts otherwise time-barred under Title VII – those acts occurring more than 180 days prior to September 17, 1999. *See* 42 U.S.C. § 2000e-5(e)(1); *see also Morgan*, 122 S. Ct. at 2070-71, 2072 ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it. . . . [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filing charges.") In this case, many of the alleged discrete acts occurred more than two years before plaintiff filed suit, and would, therefore, also be time-barred under § 1981 – those acts occurring more than two years prior to June 5, 2000. *See Moore v. Liberty Nat'l Life Ins. Co.*, 267 F.3d 1209, 1219 (11th Cir. 2001) (stating that courts must borrow Alabama two year statute of limitations for personal injury torts to implement Alabama plaintiff's § 1981 claim); *Malone v. K-Mart Corp.*, 51 F. Supp. 2d 1287, 1304 (M.D. Ala. 1999) (discussing adoption of Alabama's two year statute of limitations in Ala. Code § 6-2-38 for § 1981 claims).

[13] The court does not consider those allegations made in the complaint and addressed by defendant, but not substantiated or even mentioned in plaintiff's opposition brief. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citations omitted); *see also Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994).

acts where co-workers "hurled" ethnic slurs at plaintiff three to four times a day); *Johnson v. Booker T. Washington Broadcasting Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (finding "fifteen separate instances of harassment over the course of four months" was "not infrequent").

In addition to considerations of frequency, offensive racial epithets must be sufficiently severe to create an objectively abusive and hostile atmosphere. *See Harris*, 510 U.S. at 21 ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (internal citations omitted); *Edwards v. Wallace Cmty. College*, 49 F.3d 1517, 1521 (11th Cir. 1995) ("[R]acial slurs allegedly spoken by co-workers had to be so 'commonplace, overt, and denigrating that they created an atmosphere charged with racial hostility.'") (quoting *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990). No reasonable jury could find that the comments on which Wright bases her hostile environment claim are sufficiently severe and pervasive to create an objectively abusive and hostile environment. Wright admits she never heard Clegg use any racial profanity. Third persons informed Wright of most of the comments. The fact that Clegg did not make the alleged comments directly to Wright weighs against any claim that she experienced severe humiliation. No reasonable person could find that the nature and frequency of the statements complained of are evidence of an "atmosphere charged with racial hostility." *Edwards*, 49 F.3d at 1521; *see also Mendoza*, 195 F.3d at 1246-47 (listing cases where conduct more serious than that alleged here was held not to be sufficiently severe and pervasive).

Considering the totality of the circumstances, the court concludes that no reasonable jury could find that Wright was subjected to severe and abusive racial harassment that altered the

terms and conditions of her employment, thus creating a hostile work environment. Absent proof of harassment sufficiently severe and pervasive to alter the terms and conditions of her employment, Wright fails to establish her prima facie case of hostile environment racial harassment. Therefore, the court finds that defendant's motion for summary judgment on plaintiff's claim that she was subjected to a racially hostile environment is due to be granted.

**B. Retaliation**

> Under Title VII:
>
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Retaliation claims may be also asserted under § 1981. *See Andrews v. Lakeshore Rehabilitation Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998).

As Wright has not presented any direct evidence of retaliatory intent, the court will analyze the circumstantial evidence under the *McDonnell Douglas* burden-shifting approach. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). To establish a prima facie case of retaliation under Title VII or § 1981, the plaintiff is required to show (1) that she engaged in statutorily protected activity; (2) that an adverse employment action occurred; and (3) that the adverse action was causally related to her protected activities. *See Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1117, 1120 n.10 (11th Cir. 2001); *Hansen II v. Perry Technologies*, 206 F. Supp.2d 1223, 1237, n.21 (S.D. Fla. 2002).

The term "protected activity" includes not only filing an EEOC charge, but also complaining to superiors about race discrimination. *See Rollings v. Fla. Dep't of Law*

*Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) ("[T]he protection afforded by the [§ 2000e-3a] is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures."). Plaintiff alleges she engaged in protected activity when she complained about racial discrimination sometime in 1998 in a memorandum to Clegg. (*See* Pl.'s Ex. 11; Wright Dep. at 215.)

>Adverse employment action has been defined as follows:
>
>An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee. Conduct that falls short of an ultimate employment decision must meet some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause of Title VII.

*Bass*, 256 F.3d at 1118 (quotations and citations omitted). Wright alleges in her complaint that EPSCO retaliated against her for complaining of racial discrimination by "threatening her with termination on several different occasions, attempting to replace the plaintiff with white employees, refusing to allow the plaintiff to hire sufficient staff to manage the office, making several racially derogatory remarks to the plaintiff and to other co-employees, and generally made [sic] the plaintiff's environment so hostile that the plaintiff was forced to seek medical assistance." (Am. Compl. ¶ 13.) However, in her opposition brief, plaintiff relies only on the circumstances surrounding plaintiff's alleged termination that occurred while she was on medical leave as the basis of her retaliation claim. At oral argument, incidents involving EPSCO's "attempted hire" of Star Dexter were also discussed. The court will, therefore, consider only

these two alleged adverse actions. *See Resolution Trust Corp.*, 43 F.3d at 599 (quoted *supra*, at note 13); *see also Indep. Sprinkler Corp.*, 10 F.3d at 1568 (cited *supra*, at note 13).

The court finds that plaintiff cannot establish a claim of retaliation based on the attempt to hire Dexter. First, the record is clear that Dexter never actually came to work in Birmingham. Moreover, even if the court found that the mere threat or attempt to add Dexter to the Birmingham office was an adverse employment action, plaintiff cannot establish that her protected activity (the memo to Clegg) is causally connected to the adverse employment action (the threat to hire Dexter), because the memo was written *after* Clegg told plaintiff he intended to hire Dexter, not before hand.

The court also finds that plaintiff cannot establish a prima facie case of retaliation with regard to her alleged termination because the record demonstrates that plaintiff was not terminated. The evidence shows that plaintiff left EPSCO on medical leave and she has not returned. Temporary replacements have been hired to perform her job duties, but she has not been permanently replaced. Plaintiff discussed returning to work with Clegg, who told her to provide him with documentation from her doctor that she was ready to return to work. The record contains no evidence that plaintiff has provided Clegg with this information.

Even if the court considered plaintiff to have been terminated at some point after she left on medical leave, such termination occurred over nine months after plaintiff wrote the memo. A substantial delay between the protected activity and the adverse action, in the absence of other evidence tending to show causation, may justify judgment as a matter of law for the employer. *See Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001); *Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir. 1999). Although the burden to establish the causation element of

16

the plaintiff's prima facie case is light, *see Pennington v. City of Huntsville*, 261 F.3d 1262, 1268 (11th Cir. 2001) (construing causation element broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated"), a reasonable jury could not in this instance infer a causal relationship between the protected activity and the alleged termination over nine months later. Therefore, without evidence that establishes each element of her prima facie case, the court finds that defendant's motion for summary judgment as to plaintiff's retaliation claim is due to be granted.

As a final point, even assuming that Wright did engage in a protected activity, and that this protected activity was causally related to an adverse employment activity that occurred, *i.e.*, the alleged termination, defendant has offered a legitimate non-discriminatory reason for not allowing plaintiff to return to work.[14] Clegg did not allow Wright to return to work because her doctor never released her to come back to work, and hired Schmit and Branch on a temporary basis to operate the office while Wright was on medical leave. Plaintiff offers no evidence, and therefore no reasonable jury could conclude,[15] that EPSCO's proffered reasons were a mere pretext for unlawful retaliation. Therefore, for the foregoing reason as well, the court finds that defendant is entitled to judgment as a matter of law on this claim.

---

[14]Once the plaintiff establishes her prima facie case of retaliation, the employer is entitled to present legitimate, non-discriminatory reasons for its employment action. *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000). The plaintiff must then counter with evidence tending to show that the employer's proffered reasons are a mere pretext for discrimination. *Id.*

[15]The establishment of a prima-facie case does not in itself entitle a plaintiff to survive a motion for summary judgment. After an employer proffers non-retaliatory reasons for its actions, "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered . . . reasons is pretextual." *Chapman*, 229 F.3d at 1024-25, 1037.

## IV. CONCLUSION

For the reasons stated herein, the court is of the opinion that Defendant's Motion for Summary Judgment is due to be granted as to all of plaintiff's claims. An Order granting defendant's Motion for Summary Judgment will be entered contemporaneously with this Opinion.

**DONE** this 24th day of March, 2003.

SHARON LOVELACE BLACKBURN
United States District Judge